IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs February 1, 2022

**JAMES A. MCCURRY v. STATE OF TENNESSEE**

**Appeal from the Circuit Court for Madison County**
**No. C-20-226         Roy B. Morgan, Jr., Judge**

_____

**No. W2021-00130-CCA-R3-PC**

_____

Petitioner, James A. McCurry, appeals the denial of his post-conviction petition, arguing that the post-conviction court erred in finding that he received the effective assistance of counsel at trial. Following our review of the entire record and the briefs of the parties, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS, P.J., and JAMES CURWOOD WITT, JR., J., joined.

Joseph T. Howell, Jackson, Tennessee, for the appellant, James A. McCurry.

Herbert H. Slatery III, Attorney General and Reporter; Andrew C. Coulam, Senior Assistant Attorney General; Jody S. Pickens, District Attorney General; and Al Earls, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

Petitioner was indicted by the Madison County Grand Jury for especially aggravated kidnapping, attempted aggravated robbery, and unlawful possession of a weapon. After a jury trial, Petitioner was convicted of aggravated kidnapping as a lesser-included offense of especially aggravated kidnapping, and the remaining two offenses as charged. He was sentenced to twenty-one years in confinement. This court affirmed Petitioner's convictions on appeal and the supreme court denied his application for permission to appeal. *State v. James Anthony McCurry*, No. W2018-01780-CCA-R3-CD, slip op. (Tenn. Crim. App., at

Jackson, Oct. 30, 2019), *perm. app. denied* (Tenn. Feb. 26, 2020). The facts of this case as summarized on direct appeal are as follows:

At trial, the victim testified that on the morning of July 15, 2017, he went outside his home on East Chester Street to work on his car. [Petitioner] drove into the victim's driveway in a white sedan. [Petitioner] had been to the victim's house previously because [Petitioner] knew the victim's niece. However, the victim did not know [Petitioner].

The victim, who was sixty-three years old at the time of the incident, testified that [Petitioner] said, "'Unc, I want to talk to you.'" [Petitioner] cracked open the passenger-side door of his car and tried to "coax" the victim inside. The victim felt uncomfortable but got into the car because he thought [Petitioner] wanted to talk about an issue involving the victim's niece. The victim sat in the front passenger seat but kept one leg partially out of the car. The victim said that [Petitioner] had "[g]old teeth and blackened eyes," that [Petitioner] "looked very dangerous," and that he was "fearful" of [Petitioner]. [Petitioner] told the victim that he was not going to do anything to the victim, but the victim "had a feeling . . . something was fixing to happen."

The victim testified that [Petitioner] suddenly grabbed his left arm or leg with [Petitioner]'s right hand and that [Petitioner] said, "Give it up." [Petitioner] used his left hand to open and reach into the center console, and the victim saw a small automatic pistol. The pistol had a hammer, and the hammer was cocked. The victim had been a member of the "101st Airborne," was a "sharp shooter," and had prior experience with guns. [Petitioner] was holding the gun in his left hand, and the victim grabbed the gun and put it into "safe mode." The victim said that if he had made a mistake, [Petitioner] would have "emptied" the gun into him. [Petitioner], who was still holding the gun, tried to point it at the victim, but the victim pushed it away.

The victim testified that [Petitioner] demanded his "billfold," that they struggled over the gun, and that he was in fear. At some point, [Petitioner] moved the gun from his left hand into his right hand, put his left hand through the steering wheel, and moved the gear shift into reverse. The car went backward into the street, and [Petitioner] stepped on the gas pedal and "fire-balled down East Chester." [Petitioner] told the victim, "If you don't let it go, I'm gonna kill both of us." [Petitioner] bit the victim's arm, and the victim later discovered he had a broken finger.

- 2 -

The victim testified that [Petitioner] drove "well over five hundred feet," that they continued to struggle over the gun, and that the car hit a tree. The passenger-side door opened, and the victim was thrown out of the car with the pistol. The victim walked to the driver's side of the car. He was holding the gun but did not point it at [Petitioner]. [Petitioner] put the car into gear and drove north, and the victim started running home. Someone driving by picked up the victim and took him home, and he telephoned the police.

The victim testified that the police photographed his injuries and that he gave them an oral statement. On July 19, he gave a written statement to Investigator Ron Pugh at the police department. The victim testified at [Petitioner]'s preliminary hearing, identified [Petitioner] in court, and was confident about his identification. He said that his finger was broken for "a long time" before he realized it and that he had surgery on his finger. Recovering from the surgery took at least four months, he lost the ability to straighten his finger, and he still had pain in his finger at the time of trial.

On cross-examination, the victim testified that prior to this incident, he had seen [Petitioner] "around" but that [Petitioner] "didn't have anything to do" with him. The victim said that he did not know [Petitioner]'s mother on July 15, 2017, but knew her at the time of trial. He talked to the police on July 15 but did not give them a formal statement. At that point, defense counsel showed the victim a statement he gave to the police on July 15. The victim identified the statement as "their report" and said that "they wrote that." He acknowledged signing the statement at 10:51 a.m. at his home but said he did not read it before he signed it. The victim denied telling the police that he did not know the identity of his attacker and said that he did not remember what he told the police that day because he was "traumatized." The victim acknowledged that he never referred to [Petitioner] by name on July 15 and that he described his attacker simply as a "black male." He also acknowledged that he did not tell the police [Petitioner] demanded his billfold or said, "Give it up." The victim said he did not do so because he "wasn't asked anything about it." However, when the victim gave his statement to Investigator Pugh four days later, he "told the whole story." The victim acknowledged testifying at [Petitioner]'s preliminary hearing that he knew [Petitioner]'s mother. He said at trial, though, that he did not remember if he knew her at the time of the preliminary hearing.

The victim acknowledged that [Petitioner] did not pull him into the car, and he denied telling the police on July 15 that [Petitioner] grabbed him when he got close to the car. After [Petitioner] put the car into reverse and the car

went into the street, [Petitioner] drove the car forward with his left hand. The victim acknowledged that the car traveled much farther than five hundred feet and that it hit a tree near a gas station. He said that he could have shot [Petitioner] after the wreck but that he did not want to hurt [Petitioner]. [Petitioner] drove away, and Robert Pirtle drove the victim home. The victim described Pirtle as a friend who just happened to be driving by at the time. The victim said he did not tell the police about Pirtle because Pirtle was not involved in the case and was "an innocent person."

The victim testified that he did not know if his finger was broken during this incident and that he never mentioned a broken finger to the police because he did not know it was broken when he spoke with them. The victim did not seek treatment for his finger until August 10, 2017.

On redirect examination, the victim testified that he was very upset when he talked to the police on July 15 and that the police never asked him to name his attacker. The victim knew [Petitioner]'s name and would have given it to the police, and he gave the name to Investigator Pugh on July 19. The victim said he did not think Pirtle saw any part of the incident with [Petitioner].

Officer Joseph Mitchell of the Jackson Police Department (JPD) testified that on July 15, 2017, he responded to a robbery call on East Chester Street. When he arrived, the victim told him what had happened and showed him a gun that the victim had taken from his attacker. Officer Mitchell photographed the victim, and he described the photographs for the jury. The victim had a bite mark on his left arm, blood on the left side of his white t-shirt, and blood on his left thumb. The victim described his attacker as an African-American male with "dreads" and with "a lot of tattoos on his arms." The victim said his attacker also had a goatee, "looked like the rapper Little Wayne," and had been "beaten up" recently. Officer Mitchell knew [Petitioner] fit that description and issued a "be-on-the-lookout" for him.

Officer Mitchell testified that about twenty minutes later, he went to a home on Craig Street and photographed a white car in the back yard. The car had front-end damage, the passenger-side front tire was damaged, and a hospital visitor's tag was inside the car. Officer Mitchell did not see any drugs in the car.

On cross-examination, Officer Mitchell testified that the victim gave him an oral statement, that he wrote down everything the victim said, and that he

- 4 -

prepared a report. Officer Mitchell identified his report and acknowledged that it provided as follows: "Mr. Curry stated he had . . . [seen] the man before in the neighborhood but was not familiar with him. Mr. Curry informed me that the unknown black male asked for his niece." Officer Mitchell said he did not ask the victim if the victim had met his attacker prior to July 15.

Officer Zachary White of the JPD testified that on July 15, 2017, he assisted Officer Mitchell on East Chester Street. Officer White "cleared" a gun and collected it. He also responded to a call at a home on Craig Street and spoke with the homeowner, who told him that an African-American man had run through her front door and asked for help. She told the man to leave, and he did so. She then noticed that a white Toyota Camry was in her back yard and that a cellular telephone, a shirt, a pair of sunglasses, and a set of keys were on her couch. Officer White saw an emergency room visitor's tag inside the car, and the tag was from Trauma Room 5. Officer White had seen [Petitioner] in Trauma Room 5 a few days earlier. He explained that he had responded to a drug overdose call at an apartment complex, that [Petitioner] looked like he had been beaten, and that he followed [Petitioner] to the hospital in an ambulance.

On cross-examination, Officer White testified that the victim had blood on his t-shirt. However, Officer White did not know whose blood was on the shirt. Officer White acknowledged that the homeowner said the man who ran through her front door was "bloody." Investigator Chris Chestnut of the JPD testified that he interviewed [Petitioner] on July 21, 2017, and that [Petitioner] admitted driving to the victim's house on July 15. [Petitioner] then told Investigator Chestnut as follows: The victim was [Petitioner]'s "drug dealer," and [Petitioner] went to the victim's house to explain why he did not have the victim's money. Their conversation occurred "[a]t or around" [Petitioner]'s car. The victim pulled a gun on [Petitioner], they struggled over the gun, and [Petitioner] tried to drive away. The victim somehow ended up inside [Petitioner]'s car. [Petitioner] drove down the street and intentionally hit a tree to stop the victim. [Petitioner] drove away and went to "a girl's house." [Petitioner] left his car at the girl's house because he was not supposed to be driving, and the girl could tell Investigator Chestnut what happened. [Petitioner] did not report the incident to the police because he "didn't want to be classified as a snitch."

On cross-examination, Investigator Chestnut testified that [Petitioner] had a cut or mark on one of his knuckles. [Petitioner] said the injury occurred during the incident with the victim, and Investigator Chestnut photographed

the injury. Investigator Chestnut acknowledged that [Petitioner] waived his *Miranda* rights and that [Petitioner] wanted to talk with him.

On redirect examination, Investigator Chestnut testified that [Petitioner] said he "got bit" during the assault. Investigator Chestnut stated that he did not see any bite marks on [Petitioner]'s hands and acknowledged that the injury on [Petitioner]'s knuckle could have resulted from a struggle over a handgun.

Investigator Ron Pugh of the JPD testified that he was the case manager and that he obtained a formal written statement from the victim on July 19, 2017. Investigator Pugh researched [Petitioner]'s criminal history, found that he had a prior conviction for aggravated assault, and charged him with being a felon in possession of a handgun. He said he had not heard of "Shaunta McMurry" prior to [Petitioner]'s trial.

On cross-examination, Investigator Pugh testified that he did not question the victim about discrepancies between the victim's July 15 and July 19 statements because he did not know on July 19 that the victim had given a statement on July 15. Investigator Pugh said the wreck occurred near a gas station, and he identified a report prepared by Investigator Chestnut. According to the report, [Petitioner] claimed that "[a] clerk was outside and should have seen the vehicle drive past and the struggle." Investigator Pugh did not request that the evidence be analyzed for fingerprints or DNA. At the conclusion of Investigator Pugh's testimony, the State rested its case.

Shaunta McMurray testified that she worked at a gas station on East Chester Street. On July 15, 2017, McMurray was outside the gas station and saw "this car coming down, down East Chester." The car was white and had four doors. She said the car "caught" her attention because "[i]t wasn't moving normally as a car's supposed to move down the street. It was like they was struggling in the car." McMurray said that the driver was holding the steering wheel and that the passenger "had the door or something." She described the passenger as an "old" man and said the driver had "dreads."

McMurray testified that the car went onto the sidewalk and almost hit a woman who was waiting for a bus. The passenger "rolled up out [of] the car and ran toward the gas station." He had a gun in his hand and "had his arm out." A truck pulled up, the passenger jumped into the back of the truck, and the truck went in the direction from which the white car had come. The driver of the white car sped away.

On cross-examination, McMurray testified that she thought the incident occurred about 1:00 p.m. She said that the driver of the white car had his arm on the steering wheel and was using his other arm "to keep the passenger from doing whatever he was trying to do to [the driver]." McMurray never called the police but spoke with a detective at her home that day. She said she thought the truck was waiting on the passenger of the white car because the truck pulled up as soon as the passenger ran to the gas station. The passenger was wearing a black shirt and blue jeans. The State showed McMurray a picture of the victim, wearing a white t-shirt, that was taken by Officer Mitchell on July 15, 2017. McMurray identified the victim as the passenger of the white car and said he could have changed clothes. She said that she did not know the driver or the passenger of the white car, and she acknowledged that she did not know what happened in the car prior to her seeing it on East Chester Street. On redirect examination, McMurry testified that [Petitioner] subpoenaed her to trial.

*Id.* slip op. at 1-6.

At sentencing, the trial court heard the victim's testimony and the following proof about Petitioner's background:

The State introduced [Petitioner]'s presentence report into evidence. According to the report, the thirty-eight-year-old [Petitioner] left high school in the eleventh grade because he was committed to a juvenile facility but obtained his GED in prison. In the report, [Petitioner] admitted that he used marijuana, cocaine, and heroine in the past and admitted to using drugs prior to his incarceration in this case. [Petitioner] did not report any mental health issues, but the officer who prepared his report noted that he was "very agitated and angry [and] extremely upset at the outcome of his jury trial." Regarding [Petitioner]'s physical condition, he reported numbness in his hand due to a gunshot wound and high blood pressure. The report showed that [Petitioner] worked as a cook at McDonalds from April to June 1996 and in litter pick-up at GLT Company from August to December 2006. [Petitioner] was paroled from prison in October 2015, and he was unemployed until at least January 2016. [Petitioner] was working at Kirklands Warehouse in March 2016 and at U.S. Farathane in October 2016. [Petitioner] said in the report that he was still working at U.S. Farathane when he was arrested in this case. The report did not show any other employment.

[Petitioner] stated in the report that he had been "locked up most of his life," and the report showed that he had prior felony convictions of possession of

cocaine with intent to sell, aggravated assault, reckless aggravated assault, reckless endangerment, and evading arrest and prior misdemeanor convictions of simple possession, reckless driving, driving on a revoked license, and violating the financial responsibility law. From 1990 to 1996, [Petitioner] was adjudicated delinquent for evading arrest, criminal trespass, possession of marijuana, theft of property valued more than $1,000, resisting arrest, aggravated assault, assault, burglary, and vandalism.

*Id.* slip op. at 9.

*Post-conviction Hearing*

Petitioner testified that on July 11, 2017, four days before the underlying offenses, he was "hanging out at some apartments" when "[s]ome guys robbed [him], maybe put something in [his] drink," stripped him naked, and beat him for approximately seventeen minutes. The assault commenced in the apartment and continued outside where several people in the apartment complex gathered around and watched as the men followed him outside, "stomp[ed]" on him and slammed his head onto a brick wall. The beating was recorded and posted on Facebook. Petitioner remained hospitalized for two days. Petitioner asserted that a forensic evaluation would have revealed whether he was suffering from a mental defect or disease at the time of the instant crimes four days later on July 15, 2017.

Petitioner's counsel in city court raised his competency as an issue at his preliminary hearing and his medical records from the July 11 assault were subpoenaed. At the post-conviction hearing, Petitioner's medical records were introduced as an exhibit and showed that they were obtained pursuant to a judicial subpoena issued on September 2, 2017, by the Circuit Court Judge. The records consisted of six random pages of Petitioner's discharge transfer which revealed that Petitioner was admitted on July 11, 2017, and discharged two days later on July 13, 2017. While hospitalized, Petitioner was diagnosed with: accidental drug overdose, altered mental status, assault, drug abuse, and laceration. Petitioner was identified with an "active" or ongoing problem of "drug abuse." Petitioner was given treatment instructions for confusion which is defined accordingly:

Confusion is the inability to think with your usual speed or clarity. Confusion may come on quickly or slowly over time. How quickly the confusion comes on depends on the cause. Confusion can be due to any number of causes.

Among the causes of confusion is "concussion, head injury, or head trauma." Petitioner was given the following guidance for treatment:

> An admission to the hospital may not be needed, but a person with confusion should not be left alone. Stay with a family member or friend until confusion clears. Avoid alcohol, pain relievers, or sedative drugs until you have fully recovered. **Do not** drive until directed by your health care provider.

The discharge transfer identified the following signs and symptoms of confusion: "cloudy or unclear" thinking; feeling of disorientation; an unawareness of one's self or location, the date, or the time; and "difficulty paying attention, remembering, and making decisions." In addition, "[s]ome people also act aggressively when they are confused."

Petitioner testified that he made trial counsel aware of the July 11 assault by discussing it "numerous [] times." Petitioner recalled that the two of them "went over everything" about his case and talked about the preliminary hearing, the July 11 assault, and his diagnoses following the assault. His family provided trial counsel the video of the assault. Petitioner and trial counsel talked about the effect of the assault on his mental acuity and fitness. Petitioner informed trial counsel that: "My ability, my thinking wasn't up to speed. It wasn't – Everything wasn't clear to me." He added that he "wasn't sharp," as he was before the assault.

Petitioner faulted trial counsel for failing to investigate potential defenses based on the diagnosis of "altered mental status." Petitioner faulted trial counsel for not presenting proof of the July 11 assault and his medical records at trial and as mitigation proof at sentencing. Petitioner wanted trial counsel to call the physician who treated him at the hospital to testify about Petitioner's injuries and explain his diagnoses and his medical records. Petitioner maintained that such proof could have been used to show that he had diminished capacity at the time of the offenses. Petitioner acknowledged that two officers testified at trial that they saw him in the trauma center at the hospital. Petitioner also acknowledged that he had other ongoing cases and underwent a forensic evaluation for those cases which was performed "more than a year" after the trial in this case. Petitioner was found to be competent to stand trial, and the insanity defense could not be supported.

On cross-examination, Petitioner denied that he was assaulted because he was running around naked due to a drug overdose. Petitioner maintained that the perpetrators "beat [him] naked." He admitted that he had used marijuana and cocaine "in the past" but denied that he was using either when he was assaulted. He insisted that he told the probation officer who prepared the presentence report that he had used marijuana and cocaine "in the past," but not when he was assaulted on July 11, 2017. When asked whether he wanted the jury to know that he was "a drug addict and . . . running around the

neighborhood naked," Petitioner responded that he wanted the jury to know "the truth." Specifically, he wanted the jury to know that he was stripped naked and beaten at gunpoint.

Petitioner confirmed that he was evaluated and found competent for trial in his other cases. On cross-examination, he stated that the evaluation occurred "like [fifteen] months later." Petitioner first maintained that he only discussed his other cases for the evaluation but then acknowledged that he informed the evaluator that he suffered from confusion because of the July 11 assault. Petitioner stated that he has been regularly seeing a mental health professional and is on medication. He denied that he resides among the general inmate population. He stated that he was recently "locked up" in a special unit "for the time being" because he did not want to be among the general population.

Petitioner confirmed that issues regarding his mental health were considered in city court and that the judge found Petitioner capable of having a preliminary hearing. The video of the July 11 assault was not played at the preliminary hearing. The case was bound over.

In terms of the proof for sentencing, Petitioner recalled talking to the probation officer who prepared the presentence report and remembered telling her that his only physical ailment was a gunshot wound to his hand. He confirmed telling her that he lacked a history of mental health issues because he did not have a "history" of such issues. When asked whether he talked to the police about the instant case, Petitioner agreed that he had because he wanted to press charges against the victim for pulling a gun on him but the police did not "help" him in doing so.

Petitioner's mother, Marilyn Vinson, testified that she went to see Petitioner at Jackson-Madison County General Hospital on July 11, 2017.[1] Marilyn recalled that Petitioner's head was "tremendously" swollen. He had sustained "a lot of" head trauma. He was strapped down and appeared to be bleeding from the mouth. She was "heartbroken" at seeing Petitioner's condition. She recalled that Petitioner remained in the hospital for a couple of days. While there, he was under police protection. Petitioner stayed with her when he was released from the hospital. Marilyn recalled a distinct difference in her son's behavior after the July 11 assault. She could not tell if he understood when she talked to him.

Marilyn saw the video of the July 11 assault when it was posted "nationwide." She described the video as "awful." She testified that Petitioner was naked, repeatedly thrown

---

[1] Because this witness and the subsequent witness share the same surname, we refer to them by their first names. We intend no disrespect in doing so.

against a brick or concrete wall, and beaten. She gave trial counsel a copy of the video. She recalled that the police had also obtained a copy of the video.

Carolyn Vinson, Petitioner's aunt testified that she saw the video of the July 11 assault on Facebook after she received a call from a friend. On the video, Petitioner was stripped of his clothes and assaulted. Carolyn could not see him while he was in the hospital. She recalled that he was there two to three days. She saw Petitioner when he stayed with his mother after he was discharged from the hospital. She recalled that Petitioner's head had become swollen "really bad." Petitioner was "upset and hurt" when he learned that the assault was recorded and posted on Facebook. According to Carolyn, "everybody in Jackson" had seen the video. When asked if she noticed a difference in Petitioner after the assault, Carolyn replied that Petitioner was constantly worried and fearful of what people might do to him. She had no interaction with trial counsel. On cross-examination, Carolyn admitted that she did not observe Petitioner manifesting any signs of confusion. For instance, he recognized her and his mother.

Trial counsel represented Petitioner at trial and on appeal. Trial counsel testified that Petitioner was indicted of especially aggravated kidnapping, attempted aggravated robbery, and convicted felon in possession of a handgun. Trial counsel took advantage of the State's open file policy and met with Petitioner to review the discovery and prepare for trial. Accordingly, he was familiar with the facts of the case and the State's theory of those facts.

Trial counsel was aware of the July 11 assault because he and Petitioner talked about it "numerous times." He had also watched brief portions of the video of the July 11 assault. In terms of the video, trial counsel recalled seeing Petitioner, naked, lying on a concrete sidewalk, and being assaulted by various members of a crowd that had gathered around him. He confirmed that the video depicted Petitioner being assaulted.

Trial counsel did not observe any "red flags" regarding Petitioner's state of mind or mental fitness during their discussions. Trial counsel testified that Petitioner communicated well, appeared to be competent, asked relevant questions about pretrial motions, went over details about the case without issue, and understood the role of trial counsel, the prosecutor, and the trial judge. According to trial counsel, Petitioner provided valuable assistance in preparing for trial:

> [H]e was always able to communicate with me very well. He was even able . . . to discuss the details of the case, about what transpired, the events that unfolded, even telling some good things that happened after the fact. He told me the details about his knowledge of [the victim]. He was even able to have

me – He indicated to me he wanted me to have a witness subpoenaed. After I spoke with her, I did subpoena her.

The witness he subpoenaed was the clerk of the convenience store where Petitioner wrecked the car. An investigator interviewed the clerk, and she testified for the defense at trial.

Trial counsel did not doubt that the assault affected Petitioner's mental well-being. However, for the purpose of requesting an evaluation for the crimes which occurred on July 15, 2017, trial counsel found no indication that one was warranted based on their interactions. For instance, trial counsel testified that Petitioner understood the difference between right and wrong. Therefore, an insanity defense could not be asserted. Trial counsel similarly observed no grounds for diminished capacity due to a mental disease or a mental defect. Trial counsel did not recall Petitioner's medical records in the discovery but would not dispute Petitioner's testimony that the records were part of the discovery. Trial counsel did not recall Petitioner's being diagnosed with altered mental status. He also did not recall talking to Petitioner's mother about the case.

On cross-examination, trial counsel testified that he did not want the jury to see the video of the July 11 assault. He explained that the video would reveal to the jury that Petitioner was attacked for running around naked in the neighborhood, and he was naked because he had overdosed on drugs. Petitioner was released from the hospital two days before the crimes. His medical records revealed that Petitioner was "confused" or having issues being confused. He was discharged without a recommendation for psychiatric hospitalization. In terms of Petitioner's state of mind at the time of the crimes, trial counsel testified that Petitioner gave a statement to the police, and nothing in the statement suggested the need for a mental evaluation.

On redirect, trial counsel testified that he did not find the state of Petitioner's mental health following the July 11 assault to be relevant at sentencing. Trial counsel thought Petitioner had reported his injuries from the assault to the probation officer for the presentence report which the trial court would have considered for sentencing. Trial counsel filed a "general catch-all" factor for mitigation.

Petitioner's preliminary hearing counsel testified that he represented Petitioner in city court and at the preliminary hearing. Preliminary hearing counsel watched the video of the July 11 assault and did not find the video or the July 11 assault relevant to the defense for kidnapping. He found Petitioner fully capable of assisting in his defense:

I met with [Petitioner] and discussed the case. I don't – He seemed coherent and had the ability to discuss the case with me. So I didn't see any – I did not see how one had a bearing on the other.

He withdrew as Petitioner's counsel after the preliminary hearing when he was hired by the District Attorney's Office. He did not recall subpoenaing Petitioner's medical records for the preliminary hearing but would not dispute it if Petitioner said he did.

On cross-examination, preliminary hearing counsel testified that the assault was recorded on someone's cell phone from "some distance away" from a breezeway in the apartment complex. He stated that the video showed Petitioner, nude, and being "beaten fairly severely." He recalled that the assault occurred several days before the offenses in this case.

Preliminary hearing counsel stated that Petitioner testified in his own defense at the preliminary hearing. There were several cases on the docket, and all of them were held on the same day. Petitioner was "very upset" that the police had not charged anyone for the July 11 assault. On redirect, preliminary hearing counsel confirmed that Petitioner was fully capable of answering and understanding all the questions at the preliminary hearing.

The post-conviction court made extensive findings of fact at the conclusion of the hearing and found the evidence clear and convincing that Petitioner was assaulted and hospitalized four days before the commission of the underlying offenses:

> . . . [Petitioner] was severely beaten on that occasion some days prior to this incident for which he went on trial and which he's filed a post-conviction on. That's very clear from the sworn testimony. [Petitioner] has testified to it and the attorneys have testified to it, [Petitioner]'s family members have testified to what they saw in the video. There's no dispute over that, and I'm taking that into consideration making my decision today.

However, the post-conviction court resolved any discrepancies in the testimony in favor of trial counsel and preliminary hearing counsel with respect to Petitioner's claims. By resolving any credibility issues against Petitioner, the post-conviction court determined that Petitioner had failed to prove that trial counsel's performance was either deficient or prejudicial. This timely appeal followed.

## Analysis

Petitioner claims that the post-conviction court erred in denying his claim for ineffective assistance of trial counsel. Specifically, he argues that trial counsel was

- 13 -

ineffective because counsel failed to seek a forensic evaluation to determine his mental state at the time of the crimes on July 15, 2017; failed to explore potential defenses based on the diagnosis of "altered mental status" he received at the hospital when he was treated for the assault; failed to call his mother and his aunt to testify at trial about the assault to corroborate a showing of "altered mental status" and diminished capacity; and failed to present evidence about the July 11 assault at trial and at sentencing as mitigating evidence. The State responds that Petitioner is not entitled to relief because trial counsel made a strategic decision not to admit proof of the July 11 assault; Petitioner failed to prove that he, in fact, had diminished capacity at the time of the underlying offenses; and that but for trial counsel's failure to use the July 11 assault as a mitigating factor, the trial court would have imposed a more lenient sentence. We agree with the State.

The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. *See also Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020) ("[t]he deprivation of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act").

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms. *Kendrick,* 454 S.W.3d at 457 (quoting *Strickland,* 466 U.S. at 688); *see also Baxter v. Rose,* 523 S.W.2d 930, 932-33 (Tenn. 1975). To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland,* 466 U.S. at 694; *Kendrick,* 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick,* 454 S.W.3d at 458 (citing *Williams v. Taylor,* 529 U.S. 405-06 (2000)).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State,* 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if we determine that either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1); *see Dellinger v. State*, 279 S.W.3d 282, 293-94 (Tenn. 2009). "Evidence is clear and convincing when there is no serious or

substantial doubt about the accuracy of the conclusions drawn from the evidence." *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998) (citing *Hodges v. S.C. Toof & Co.*, 833 S.W.2d 896, 901, n.3 (Tenn. 1992)).

The factual findings of the post-conviction court are binding on an appellate court unless the evidence in the record preponderates against those findings. *Howard,* 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State,* 40 S.W.3d 450, 456, n.4 (Tenn. 2001). The post-conviction court's application of law to its factual findings is reviewed de novo with no presumption of correctness. *Howard,* 604 S.W.3d at 57; *Holland v. State,* 610 S.W.3d 450, 455 (Tenn. 2020). A claim of ineffective assistance of counsel presents a mixed question of law and fact that is subject to de novo review with no presumption of correctness. *Id.*; *Dellinger*, 279 S.W.3d at 294; *Pylant v. State*, 263 S.W.3d 854, 867 (Tenn. 2008).

Review of counsel's performance "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689; *see also Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). We will not second-guess a reasonable trial strategy, and we will not grant relief based on a sound, yet ultimately unsuccessful, tactical decision. *Granderson v. State*, 197 S.W.3d 782, 790 (Tenn. Crim. App. 2006). Deference to the tactical decisions of counsel applies only if counsel makes those decisions after adequate preparation for the case. *See Cooper v. State,* 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Petitioner argues that trial counsel's performance at trial was ineffective because trial counsel failed to secure a forensic evaluation to determine Petitioner's mental state on July 15, 2017, the date of the underlying offenses; failed to pursue a diminished-capacity theory of defense; failed to present evidence of the July 11 assault; and failed to call his mother and his aunt to corroborate a diminished-capacity theory of defense. The State contends that Petitioner is entitled to no relief because there was no proof that Petitioner suffered from diminished capacity when he kidnapped the victim and trial counsel made a strategic decision not to present evidence of the July 11 assault at trial.

Diminished capacity is not "a justification or excuse for a crime, but rather an attempt to prove that the defendant, incapable of the requisite intent of the crime charged, is innocent of that crime but most likely guilty of a lesser included offense." *State v. Hall*, 958 S.W.2d 679, 688 (Tenn. 1997). Diminished capacity is "a defendant's presentation of expert, psychiatric evidence aimed at negating the requisite culpable mental state." *Id.* As such, evidence to negate the requisite must include expert testimony. "[Diminished capacity] is . . . not a defense at all but merely a rule of evidence." *Id.* at 688-89 (quoting *United States v. Pohlot,* 827 F.2d 889, 897 (3rd Cir. 1987)). "[E]vidence of a mental

disease or defect that does not rise to the level of an insanity defense, nevertheless, is admissible to negate the requisite culpable mental state for the charged offense." *State v. Terrance Lawrence, a.k.a. Terence Lawrence,* No. M2020-00630-CCA-R3-CD, 2021 WL 1116408, at *6 (Tenn. Crim. App., at Nashville, Mar. 24, 2021), no perm. app. filed. (citing *State v. Phipps,* 883 S.W.2d 138, 149 (Tenn. Crim. App. 1994)).

The supreme court emphasized the distinction between "mental disease or defect" and "emotional state or mental condition":

> [W]e emphasize that the psychiatric testimony must demonstrate that the defendant's inability to form the requisite culpable mental state was the product of a mental disease or defect, not just a particular emotional state or mental condition. It is the showing of lack of *capacity* to form the requisite culpable mental intent that is central to evaluating the admissibility of expert psychiatric testimony on the issue.

*Hall,* 958 S.W.2d at 690 (emphasis in original).

Although the post-conviction court found evidence of the July 11 assault to be clear and convincing, the court was unconvinced that the July 11 assault warranted a forensic evaluation or provided the grounds for pursuing diminished capacity at trial. In making this finding, the post-conviction court accredited the testimony of trial counsel and preliminary hearing counsel:

> When it comes to the state of mind for [diminished capacity proof at trial or mitigation proof at sentencing], the Court notes this. I give credibility to the testimony of [trial counsel] and to [preliminary hearing counsel] as they testified today.
>
> [Trial counsel] testified under oath there was no issue as to state of mind. He communicated, "He" being the Petitioner, very well. [Petitioner] gave details of what happened before and what happened after, what transpired [trial counsel] said. [Petitioner] gave details about what transpired, how he knew the victim in this case. [Petitioner] discussed with [trial counsel] subpoena of witnesses. One was a [Shaunta McMurray] I believe that testified, that being maybe the store employee. There was no evidence at all based on [trial counsel]'s education, training and experience as a defense lawyer as to a need for an evaluation. I know there was one done later. There was testimony to that effect that showed no problem. [Trial counsel] said there was no evidence of need of one here. He indicated from his sworn testimony that they even discussed – "they," he and [Petitioner] – even discussed possible

motions to be filed, and there was just no issue of diminished mental capacity. There was no issue as to whether this would be used for sentencing purposes after the fact upon conviction. [Trial counsel] did not think that it would weigh in in any other way at sentencing that would have been of any value in this case.

The post-conviction court found preliminary hearing counsel's testimony equally credible regarding Petitioner's state of mind:

> . . . I give credibility to of (sic) [preliminary hearing counsel] that [Petitioner] testified at his own preliminary hearing and had no trouble recalling any problem at all, and he spoke about this case with [Petitioner], he spoke to [Petitioner] about the case and what had occurred, and again, [Petitioner] testified. So there was no indication of any issue to be presented on this case as relates to that video and that beating at that time.

The record supports the post-conviction court's findings. Both trial counsel and preliminary hearing counsel testified that they were each aware of the July 11 assault. Both attorneys had discussed the July 11 assault with Petitioner and had watched the video of the assault in preparation for their respective hearings. Both attorneys corroborated Petitioner's testimony regarding the assault. However, despite the severity of the assault, neither counsel found grounds to request a forensic evaluation or to question Petitioner's mental fitness to assist in the preparation of his defense at the preliminary hearing or at trial based on their interactions with Petitioner. "[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Strickland*, 466 U.S. at 691.

According to preliminary hearing counsel, Petitioner was "coherent" and able to discuss the case. Although preliminary hearing counsel did not see how the July 11 assault had any bearing on Petitioner's case or his mental fitness, the issue of Petitioner's mental fitness was raised in city court. The city court judge found Petitioner competent for the preliminary hearing. Preliminary hearing counsel recalled that Petitioner testified in his own defense at the preliminary hearing. Petitioner had several cases heard on that same day, and preliminary hearing counsel testified that Petitioner had no difficulty understanding and answering questions for all of his cases that day.

Similarly, trial counsel testified that his interactions with Petitioner led him to believe that a forensic evaluation was not necessary and that a defense based on mental defect or disease was unsupportable. Trial counsel testified that Petitioner communicated well, asked relevant questions about pretrial motions, understood the role of trial counsel,

- 17 -

the prosecutor, and the trial judge, and possessed a strong command of the case. Trial counsel found Petitioner's recollection of the incident to be particularly helpful in developing trial strategy. For instance, Petitioner suggested calling the convenience store clerk as a witness because she had observed the car wreck. Based on this information, trial counsel subpoenaed Shaunta McMurray. At trial, she testified that she had witnessed the wreck and identified the victim and Petitioner as the occupants of the car. More importantly, her testimony was consistent with Petitioner's narrative of the facts. In addition, trial counsel found nothing in Petitioner's statement to the police to suggest the need for a forensic evaluation. Based on trial counsel's interactions with Petitioner and Petitioner's statement to the police, trial counsel's decision not to request a forensic evaluation fell squarely within the range of competence.

In addition, Petitioner has not shown that he was prejudiced by trial counsel's decision to forego a forensic evaluation. Approximately twelve to fifteen months after the trial in this case, Petitioner underwent a forensic evaluation to determine his competency to stand trial and his sanity for another case. That evaluation resulted in a conclusion that Petitioner was competent and sane. The conclusion of the evaluation strongly suggests that a forensic evaluation would not have provided favorable evidence on Petitioner's behalf in this case. At the post-conviction hearing, Petitioner admitted that the July 11 assault was considered in the evaluation in the other case. "[T]he mere possibility of success based on a defense for which there existed little or no evidentiary support is not enough to establish constitutionally inadequate counsel." *Long v. Krenke*, 138 F.3d 1160, 1162 (7th Cir.1998). Accordingly, Petitioner has not established prejudice.

In terms of trial counsel's failure to call witnesses to establish diminished capacity, the post-conviction court found no prejudice because Petitioner failed to present material and favorable *expert* testimony:

> As to the potential witnesses. There's been no witnesses brought forward today. [Post-conviction counsel] pointed out why he could not get an expert, but there's no witnesses for me to consider today, potential witnesses, that would testify to anything that would certainly have been a benefit at the trial regarding diminished capacity or sentencing.

As for the witnesses who did testify at the post-conviction hearing, the post-conviction court determined that their testimonies about Petitioner's state of mind and physical well-being after he was discharged from the hospital would not have undermined the outcome of the trial:

> Now I know [Petitioner]'s family members have testified to his condition and when he came home some day or two or three after this incident and he

- 18 -

stayed with his mother, Ms. Carolyn Vinson, and he had some swelling around the head, and [Petitioner] understandably so, was very upset about Facebook and this video, him in a nude condition and being beaten. He was very upset, and he was worried. [Petitioner's mother] testified he was worried about people. He was upset and worried about people. I understand and could understand why [Petitioner] would be under the circumstances of what was shown in that video and the circulation that it received, but again does not relate to any type of post-conviction relief in this case.

\*\*\*

I've heard, of course, from the mother and aunt today, but I don't find anything that I've heard today is sufficient to carry a burden of proof that any particular witness would have made any difference or have been of any value at the trial of this case. Again, you can always speculate on hindsight and look at things differently, but for the reasons stated, the Court finds very specifically that [Petitioner] failed to carry the burden of proof by clear and convincing evidence, and that is a heavy burden. He failed to carry the burden in this case of post-conviction, so I'll deny the post-conviction petition.

The evidence does not preponderate against the post-conviction court's findings. "When a petitioner contends that trial counsel failed to discover, interview, or present witnesses in support of his defense, these witnesses should be presented by the petitioner at the evidentiary hearing." *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "There can be no speculation 'as to what the [expert] evidence would have shown and . . . how it would have benefitted Petitioner.'" *Brimmer v. State*, 29 S.W.3d 497, 512 (Tenn. Crim. App. 1998) (quoting *Davis v. State*, 912 S.W.2d 689, 698 (Tenn. 1995)). Diminished capacity requires the testimony of an expert. *Hall*, 958 S.W.2d at 691-92; *Faulkner*, 154 S.W.3d at 56-58. Here, none was called. Petitioner has failed to demonstrate prejudice. *Black*, 794 S.W.2d at 757.

Furthermore, Petitioner's discharge transfer from the July 11 assault offers no evidence of diminished capacity at the time of the offenses. The discharge transfer reveals that Petitioner was suffering from "confusion" which did not require further hospital admission but instead included instructions "not [to] be left alone" and to stay with "a family member or friend until the confusion clears." There was no recommendation for Petitioner to seek psychiatric treatment. Petitioner was instead instructed to "[a]void alcohol, pain relievers, or sedative drugs" until the confusion cleared. Because Petitioner offered no evidence of diminished capacity or a need for a forensic evaluation, we agree

with the post-conviction court that trial counsel's performance was neither deficient nor prejudicial.

Next, the post-conviction court found trial counsel's decision not to show the video of the July 11 assault at trial was a strategic decision entitled to deference:

> [Trial counsel] testified under oath on [c]ross-[e]xamination, he didn't think it would be a good strategy for the jury to see this video and the issues that were related to the video, as to what was taking place and why it was taking place, and that, of course, the Petitioner had been discharged a couple of days prior to this particular incident.

Trial counsel's strategy regarding the July 11 assault was entitled to deference because it was informed by adequate preparation. Trial counsel was aware of the circumstances of the assault because he had watched portions of the video and had talked to Petitioner about the assault. Trial counsel testified that offering evidence about the July 11 assault made for poor strategy because the jury would be exposed to the fact that Petitioner was running around naked due to a drug overdose. The hospital discharge transfer shows that on the night of the July 11 assault, Petitioner was diagnosed with "accidental drug overdose" and "drug abuse." He was also identified with an "active" drug abuse problem. As the State argues, "opening the door" to evidence of the July 11 assault, "would have been, at best, a questionable decision by trial counsel." Given the humiliating circumstances surrounding the assault and no proof of Petitioner's lack of capacity due to a mental disease or defect to form the requisite mental intent of the convicted offenses, trial counsel's decision not to present evidence of the July 11 assault was presumptively reasonable. *Davidson v. State*, 453 S.W.3d 386, 393 (Tenn. 2014) (post-conviction claims are reviewed with "the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all strategic and tactical significant decisions").

The record shows nevertheless that the jury was aware of the assault without being privy to the details of the assault. At trial, Officer White testified that he was acquainted with Petitioner because he had responded to the July 11 assault and saw Petitioner at the scene. *McCurry,* No. W2018-01780-CCA-R3-CD, slip. op. at 4-5. Officer White testified that Petitioner "looked like he had been beaten." *Id.* at 5. Officer White followed Petitioner to the hospital where he was placed in a Trauma Room. *Id.* at 4-5. Thus, Petitioner cannot show that he was prejudiced, and he was properly denied relief.

Lastly, Petitioner is entitled to no relief on his claim regarding trial counsel's failure to offer evidence of the July 11 assault as mitigation proof for sentencing. The State argues that there was no reasonable probability the trial court would have imposed a more lenient sentence using the July 11 assault as a mitigating factor, and we agree. Contrary to

Petitioner's assertion, testimony about the July 11 assault was revealed at trial and was therefore before the trial court for sentencing. *Id.* at 4-5; *see also* T.C.A. § 40-35-210(b)(1) ("the court shall consider . . . The evidence, if any, received at the trial and the sentencing hearing"). And as previously discussed, Petitioner has not established by clear and convincing evidence that he suffered from a mental defect or disease at the time of the offenses to pursue diminished capacity as a defense at trial. The same holds true for Petitioner's claim against trial counsel at sentencing. Here, Petitioner has not demonstrated how the July 11 assault or his diagnosis of confusion from the assault would have constituted a mitigating factor. Petitioner faults trial counsel for failing to present the July 11 assault at sentencing; yet, when interviewed for the presentence report, he declined to mention the July 11 assault, detail the injuries he sustained, or explain how his diagnosis should mitigate his sentence. *See, e.g., James Anthony McCurry,* No. W2018-01780-CCA-R3-CD, slip. op. at 9. Petitioner has simply failed to show how the outcome of his sentencing would have been different given the application of three enhancement factors. In determining the length and alignment of his sentences, the trial court could not ignore the overwhelming proof of Petitioner's lengthy criminal history. Two of the three enhancement factors found by the trial court were based on Petitioner's criminal history as an adult and as a juvenile. Petitioner had a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range, and he was adjudicated to have committed acts as a juvenile that would constitute a felony if committed by an adult. *Id.* at 9-10; *see also* T.C.A. § 40-35-114(1), (16). He was adjudicated delinquent as a juvenile and "ha[d] been committing crimes since he was eighteen years old." *See James Anthony McCurry,* No. W2018-01780-CCA-R3-CD, slip op. at 12. He admitted that he has been "locked up" for most of his life. *Id.* Trial counsel's decision not to use the July 11 assault as a mitigating factor was reasonable and did not prejudice Petitioner. He is not entitled to relief.

## Conclusion

For the foregoing reasons, the judgment of the post-conviction court is affirmed.

_____

JILL BARTEE AYERS, JUDGE

- 21 -